UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

NATHANIEL WRIGHT,

                         Petitioner,

-vs-

DARWIN E. LaCLAIR, SUPERINTENDENT
OF FRANKLIN CORRECTIONAL FACILITY,

                         Respondent.

_____

DECISION AND ORDER

16-CV-6193 (CJS)

## INTRODUCTION

The petitioner, Nathaniel Wright ("Wright"), brings this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Wright challenges his conviction in the New York Supreme Court on one count of sexual abuse in the first degree.  For the reasons explained below, the petition for a writ of habeas corpus is denied.

## BACKGROUND

On March 29, 2012, Rochester police investigator Robert O'Shaughnessy visited Wright in his home to discuss allegations of sexual assault that had been made against Wright by two male children.  At that time, Wright signed a statement admitting to stroking the penis of one of the children.  Investigator O'Shaughnessy visited Wright a second time on April 4, 2012 to continue the discussion, during which Wright signed a second statement admitting to touching the second child's penis, as well.  On June 19, 2012, Wright was arraigned in the New York Supreme Court for Monroe County on a two-count indictment: sexual abuse in the first degree and endangering the welfare of a child.  Wright initially entered a plea of not guilty.

Prior to trial, Wright moved to suppress the statements that he had signed during Investigator O'Shaughnessy's visits.   At a *Huntley* hearing, Investigator O'Shaughnessy recounted his first visit to Wright's home and the conversation he had there with Wright:

Q:  Could you describe for the Judge your initial interaction with [Wright] on March 29?

A:  It was pleasant.  I introduced myself, asked if I could come in.  He allowed me to come in.  Invited me into the kitchen.  He and I sat at, like, a kitchen island in the middle of his kitchen.  It was just him and I . . . .

Q:  Did you make any threats or promises in an effort to get him to speak with you?

A:  No, I did not . . . .

Q: Can you describe your conversation with him while you sat at the kitchen island on March 29?

A: I explained to him that there were allegations made by relatives of his, his [G]odsons.  At first he denied any inappropriate sexual activity, and then during the course of our – I believe we talked for a little over an hour, maybe an hour and 15 minutes – he disclosed that he had sexual contact with [victim 1] . . . . He said that back in, I believe it was December 2011, he had masturbated, placing his hand into the pants and underwear of [victim 1], as skin on skin and masturbated him . . . . I took, I believe, a one-page or two-page handwritten statement.

Q:  And who actually wrote this statement?

A:  I wrote the statement out . . . . He asked that I read it to him . . . . I did . . . . Just prior to signing it, his girlfriend . . . had come home.  Before she walked in the door he told me he wasn't sure if he should sign it because [the] last time he signed a statement he went to prison.  I asked him if it was correct and he said it was correct . . . . At that time [his girlfriend] entered the house, wanted to know what was going on.  He explained to her what was going on.  She appeared to read the statement, walked to the back kitchen door . . . While she was looking out the back door, he picked up my pen off the table and signed the statement . . . .

Q: . . . [D]id you attempt to speak with him about [victim 2]?

A:  I did.  I started to get into the allegations made by [victim 2] but I had an emergency police scuba call-out I had to go to . . . . so I told him I would probably get in touch with him the following week and maybe he would be able to think about it over the weekend and maybe it would jog his memory.

*Huntley* Hr'g Tr. 6:11–10:24, Aug. 9, 2012.  The signed statement was then introduced into

evidence.  *Id.* at 10:7–8.

On April 4, 2012, Investigator O'Shaughnessy visited Wright in his home for a second

time.  Investigator O'Shaughnessy described his second visit to Wright's home as follows:

> A:  . . . . I sat at the same kitchen island with [Wright].  We had – probably had a
> five-minute conversation, [Wright's girlfriend], [Wright] and myself, where [the
> girlfriend] informed me that they had looked online as a couple over the weekend
> to see if they could obtain counseling for [Wright]'s problem but they were having
> a hard time because of his insurance that would pay for it and she ended up
> leaving to go to work . . . .
>
> Q:  And after she left did you then discuss the allegations concerning [victim 2]?
>
> A:  I did.
>
> Q:  And prior to speaking with him did you use any force or threats of force, or for
> that matter throughout any of your interaction with him did you use force or
> threats of force?
>
> A:  No, sir.
>
> Q:  Did he agree to speak with you?
>
> A:  Yes, he did.
>
> Q:  At any time did he ask for a lawyer?
>
> A:  No, he did not . . . .
>
> Q:  Did he appear to be under the influence of alcohol or drugs or any other
> substance on April 4?
>
> A:  No, he appeared sober.
>
> Q:  And was he handcuffed at that time?
>
> A:  He was never handcuffed at the time I saw him, not even when I arrested him
> and took him to jail . . . .
>
> Q:  Could you describe your conversation with [Wright] concerning [victim 2] at
> that point?

A:  Yeah.  We – I told him what the allegations were and he stated that he had, in fact, on two occasions touched [victim 2]'s penis, skin to skin, back probably when [victim 2] was about seven years old.  And that was about seven years prior to where we were at that date . . . .  He also admitted at that time there was a second sexual contact with [victim 1] back around December, the same type of masturbating . . . .

Q:  And did you record your conversation of April 4th in any way?

A:  I did.  I did a handwritten statement which eventually ended up being two pages . . . .  I wrote the statement out . . . .  I gave him the opportunity to read it himself or have me read it . . . .  He signed both pages.

*Huntley* Hr'g Tr. 11:6–14:15, Aug. 9, 2012.  The second signed statement was then introduced

into evidence.  *Id.* at 14:23–24.

Wright also testified about his conversations with Investigator O'Shaughnessy on March

29 and April 4, 2012:

Q:  When you signed [the first] statement, why did you sign that statement?

A:  Because I asked [Investigator O'Shaughnessy] three times what happened if I didn't sign it, and he told me I'm going to jail . . . .

Q:  And what led you to signing that second statement on April 4th?

A:  The fear that I was gonna go to jail . . . .

Q:  You signed that statement.  Are the contents of that statement true, to your memory?

A:  I initially told him that I didn't do it because I truly didn't do it.  I mean – and then he goes – he coerced me into saying I did because of what he did . . . .

Q:  Are any of the allegations of you touching [victim 2] correct?

A:  No.

Q:  Are any of the allegations of you touching [victim 1] correct?

A:  No, because I hadn't seen them in two-and-a-half years . . . . But he didn't give me the chance to say that.

*Huntley* Hr'g Tr. 22:10–25:4, Aug. 9, 2012.

After an extensive cross-examination of Wright by the prosecutor, the proofs were closed

and the trial court rendered a decision on Wright's motion to suppress.  The trial court stated:

> . . . [t]he Court does find the testimony of Investigator O'Shaughnessy in relevant part and for purposes of the limited issue or issues to be decided by this Court to be credible in nature.

> . . . . As to the relevant issues presented, the Court does not, respectfully, find the testimony of [Wright] to be totally credible in nature . . . .

> . . . . The interview on both occasions occurred in the kitchen of [Wright]'s residence.  On each occasion he was not handcuffed.  There were no threats or promises or force exerted upon the defendant, and this is somewhat contrary to [Wright]'s testimony where he indicated that there may have been some type of undue influence in that he was told that the would be arrested or go to jail if he didn't sign the statements.

> Further, I will note, and the evidence is clear, that the defendant never requested an attorney or that any interview cease, and that is in reference to both of the occasions noted by this Court.

> In addition, the defendant was not intoxicated or under the influence of drugs . . . . there is no evidence before the Court of any medical and/or emotional or mental limitations by the defendant at the time of the respective interviews.  There's also no evidence before this Court that the defendant at any time did not fully understand and was completely aware of the questions that were being posed to him and the answers that he provided to the investigator.

> . . . . Following initial oral denials on each occasion the defendant later admitted by way of incriminating conduct his criminal actions as pertaining to both [victims], all as set forth in each of the exhibits received in evidence . . . .

> Accordingly, the Court does hereby conclude that the prosecution has sustained its burden by establishing that [Wright]'s written statements preceded by the oral admissions made by him were voluntary and not the result of the defendant's will being overborne by any coercive police tactics or conduct.  Thus, all statements made by [Wright] as related at this hearing and also as received in evidence before this Court . . . were obtained with due regard to [Wright]'s constitutional rights and are admissible at trial subject to relevant and appropriate objections by counsel as an exception to the hearsay rule.

*Huntley* Hr'g Tr. 55:25–61:23, Aug. 9, 2012.

On August 14, 2012, Wright pled guilty to one count of sexual abuse of the first degree. On September 25, 2012, he was sentenced to a determinate term of imprisonment of five years, plus a period of ten years post-release supervision.

Wright timely filed a direct appeal raising a single issue: that the prosecution failed to prove beyond a reasonable doubt that the statements attributed to him were knowingly and voluntarily made. The New York State Supreme Court, Appellate Division Fourth Department affirmed the judgment of the trial court, and rejected Wright's contention that the court erred in refusing to suppress his statements to the police. *People v. Wright*, 129 A.D.3d 1695, 1695– 96 (N.Y. App. Div. 2015). The Appellate Division found that "the record of the suppression hearing supports the court's determination that the statements were not coerced, i.e., defendant received no promises in exchange for making the statements nor was he threatened in any way, and the court's determination is entitled to great deference." *Id*. at 1695 (internal quotations omitted). As to the conflicting testimony of Wright and Investigator O'Shaughnessy at the *Huntley* hearing, the Appellate Division stated that it "merely raised an issue of credibility that the court was entitled to resolve in favor of the People." *Id*. (citations omitted). Wright then applied for a certificate granting leave to appeal to the New York Court of Appeals, but the application was denied. *People v. Wright*, 26 N.Y.3d 973 (N.Y. 2015).

Wright is now before this Court *pro se* seeking a writ of habeas corpus. The Court is in possession of, and has reviewed, the state record, including transcripts of the hearings, and Wright's direct appeal to the Appellate Division and the New York Court of Appeals. Petitioner has not challenged the record below as inaccurate. Accordingly, the Court finds an evidentiary hearing unnecessary.

Further, 28 U.S.C. § 2244(d)(1) provides a one-year statute of limitations for review of federal habeas corpus petitions filed by state prisoners. Where a habeas petitioner does not file

a petition for certiorari in the United States Supreme Court, the petitioner's state court conviction becomes final, for purposes of triggering the one-year limitations period in which to seek habeas relief, 90 days after the application for leave to appeal to the relevant state's highest court is denied. *McKinney v. Artuz*, 326 F.3d 87, 96 (2d Cir. 2003) (citing U.S. Sup. Ct. R. 13, "Review on Certiorari: Time for Petitioning"). In the instant case, because Petitioner did not seek certiorari in the Supreme Court, his conviction became final 90 days after the September 3, 2015 denial of leave to appeal to the Court of Appeals. Accordingly, Petitioner's habeas petition, filed on March 23, 2016, is timely.

LEGAL STANDARD

Wright brings his habeas corpus petition pursuant to 28 U.S.C. § 2254. The general legal principles applicable to such a claim are well settled. Federal courts are obliged to give deference to state courts' decisions. *See Chrysler v. Guiney*, 806 F.3d 104, 117 (2d Cir. 2015) (citing The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214). For claims adjudicated on the merits in state court, a federal court may issue a writ of habeas corpus only when the state-court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . ." *Id.* (quoting 28 U.S.C. § 2254(d)(1)).

A principle is "clearly established Federal law" for § 2254 purposes when it is embodied in a Supreme Court holding framed at the appropriate level of generality. *Washington v. Griffin*, 876 F.3d 395, 403 (2d Cir. 2017) (quoting, *inter alia*, *Thaler v. Haynes*, 559 U.S. 43, 47 (2010)), *cert. denied*, 138 S. Ct. 2578. A state court decision is "contrary to" such clearly established law when the state court either has arrived at a conclusion that is the opposite of the conclusion reached by the Supreme Court on a question of law, or has "decided a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Washington*, 876 F.3d at 403

7

(quoting *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000)).  An "unreasonable application" of such clearly established law occurs when the state court correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case such that "the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Washington*, 876 F.3d at 403 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

DISCUSSION

Because Wright is proceeding *pro se*, the Court has construed his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).  In his petition, Wright essentially argues the trial court erred when it failed to suppress his statements to Investigator O'Shaughnessy, because such statements were not voluntarily made.  After carefully reviewing the record, the Court finds that the trial court's decision to deny suppression was neither "contrary to," nor did it involve an unreasonable application of, clearly established Federal law. 28 U.S.C. § 2254(d)(1).

It is well-settled that "[a] confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given." *United States v. Taylor*, 745 F.3d 15, 23–24 (2d Cir. 2014) (quoting *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir.1991) (internal quotation marks omitted)). The voluntariness inquiry should examine "the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." *Anderson*, 929 F.2d at 99.  An individual's mental state should be considered in the voluntariness inquiry to the extent it allowed law enforcement to coerce the individual. *Colorado v. Connelly*, 479 U.S. 157, 164–65 (1986).

Looking first to Wright's background and experience, the Court notes that he is familiar with police questioning and the consequences of confession. *See, e.g., United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995). The transcript from his sentencing hearing shows that Wright had been convicted previously of sexual abuse in the first degree and sodomy. Sent. Hr'g Tr., 6:9–22, Sept. 25, 2012. In addition, Investigator O'Shaughnessy reported that during his first meeting with Wright, Wright hesitated to sign the written statement "because the last time he signed a statement he went to prison." Moreover, there is nothing in the record to indicate that Wright lacks maturity, education or intelligence. He was fifty years old at the time of his plea hearing, and the trial court specifically found that "there is no evidence before the Court of any medical and/or emotional or mental limitations by [Wright] at the time of the respective interviews. There's also no evidence before this Court that [Wright] at any time did not fully understand" the questions Investigator O'Shaughnessy asked or the answers Wright gave. *Huntley* Hr'g Tr. 57:9–21, Aug. 9, 2012.

With respect to the conditions of Wright's interrogation, it is significant that Wright was not in custody at the time he confessed to Investigator O'Shaughnessy. A defendant is in custody when "a reasonable person in the defendant's position would have understood himself to be 'subjected to restraints comparable to those associated with a formal arrest.'" *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir.1992) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 441 (1984)). The confessions obtained in this case, however, occurred while Wright was seated in his kitchen, without handcuffs, in the course of a "pleasant" hour-long conversation with Investigator O'Shaughnessy. As the trial court noted, "any reasonable person innocent of any crime would not have believed that he was under arrest or that his freedom was significantly impaired . . . [due to the facts of Wright] not being handcuffed and there being no threats or promises made to [Wright] and further that on each occasion [Investigator O'Shaughness] left

the home with [Wright] remaining therein without any formal arrest at that time." *Huntley* Hr'g Tr. 60:17–24, Aug. 9, 2012.

Lastly, Investigator O'Shaughnessy's conduct was not such as to impact the voluntariness of Wright's statements.  O'Shaughnessy requested permission to enter Wright's home, sat with Wright at his kitchen table, and afforded Wright ample opportunity to read or have his statement read to him prior to signing.  At one point, Wright was even permitted to show the statement to his girlfriend so that she knew what was going on.  After Wright signed the first statement, Investigator O'Shaughnessy had to leave to attend to an emergency, and was absent for over five days before he again sat down with Wright to discuss Wright's conduct with the second victim.  Even then, Investigator O'Shaughnessy again left Wright's home without arresting Wright following the discussion, and only days later returned to arrest Wright.  Moreover, the trial court found that Investigator O'Shaughnessy at no time used force, or the threat of force, to compel a confession.

CONCLUSION

Based on the foregoing, the Court finds that Wright has failed to show that the trial court's decision not to suppress his statements to Investigator O'Shaughnessy was "contrary to," or involved an unreasonable application of, clearly established Federal law.  28 U.S.C. § 2254(d)(1).  Accordingly, Wright's application under 28 U.S.C. § 2254 is denied.  The Clerk of the Court is hereby ordered to close this case.

Pursuant to 28 U.S.C. § 2253, the Court declines to issue a certificate of appealability, since Wright has not made a substantial showing of the denial of a constitutional right.  The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962).  Further requests to proceed on appeal *in forma*

*pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

So Ordered.

Dated:      July 30, 2020
            Rochester, New York

                    ENTER:


                    CHARLES J. SIRAGUSA
                    United States District Judge